IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 22-cr-013-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

2.    **SAUL CURIEL-RODRIGUEZ**,

    Defendant.

---

**ORDER DENYING MOTION TO SUPPRESS**

---

In the Indictment, the Government charges Defendant Saul Curiel-Rodriguez with:

- Count 2: one count of knowing and intentional possession with intent to distribute one or more of the following controlled substances: (1) a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide (fentanyl), a Schedule II Controlled Substance; (2) a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance; and (3) a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, all in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and

- Count 3: one count of knowing and intentional possession with the intent to distribute one and [sic] more of the following controlled substances: (1)

> 1 kilogram and [*sic*] more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance; (2) 500 grams and more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance; and (3) 40 grams and more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4- piperidinyl] propenamide (fentanyl), a Schedule II Controlled Substance, all in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(i), (b)(1)(B)(ii)(II), and (b)(1)(B)(vi), and Title 18, United States Code, Section 2 (aiding and abetting).

(ECF No. 19.)[1]

Before the Court is Defendant's Motion to Suppress Evidence ("Motion"), filed on May 25, 2022.  (ECF No. 42.)  On June 13, 2022, the Government filed its response. (ECF No. 52.)  On July 7, 2022, Defendant filed his reply.  (ECF No. 57.)  On July 20, 2022, the Government filed its sur-reply.  (ECF No. 65.)

After reviewing the parties' submissions and attached evidence, the Court concludes no evidentiary hearing is necessary to resolve the Motion.  Neither party explicitly requests an evidentiary hearing.  Additionally, even Defendant states in his reply that "it appears that there is little-to-no dispute regarding the facts and events leading to [his] arrest, and that the parties simply dispute whether [he] was arrested or only temporarily detained at the time he was placed in handcuffs."  (ECF No. 57 at 1 n.1.)  Confusingly, Defendant later states that the "gist of the dispute between the

---

[1] Count 1 of the Indictment contains charges only against Defendant Juan Carlos Carmona-Rivas.  The quantity of drugs in Count 2 was seized from a vehicle.  The quantity of drugs in Count 3 was seized from an apartment.  Count 3 contains charges against both Carmona-Rivas and Defendant.

parties is primarily factual." (*Id.* at 7.) However, he appears to again concede that a hearing is not necessary by stating that "[w]ithout even hearing testimony from the officers, this dispute is laid clear upon reviewing the instructions provided by Det. Garcia and the reports of the two officers involved in [Defendant's] arrest." (*Id.* at 8.)

For its part, the Government states in its sur-reply that "there is only a legal dispute, to be resolved by the Court, as to whether [Defendant] was detained or arrested at the time he was asked out of the Impala and handcuffed. . . . That resolution must be based on the facts of the police/suspect encounter, which as the defendant admits, are undisputed." (ECF No. 65 at 9.)

As the Court explains in detail below, it is the Government's burden to demonstrate that a warrantless stop is justified. However, on a motion to suppress, the defendant must present some argument or evidence demonstrating a factual dispute requiring an evidentiary hearing exists. For reasons developed more fully *infra*, the Court finds that here, Defendant has not pointed to anything in the record which creates such a factual dispute. To the contrary, as Defendant's statements cited above show, he concedes there is little to no factual dispute on the relevant issues. Therefore, the Court remains convinced that no evidentiary hearing is necessary.

For the reasons set forth herein, the Motion is denied.

## I. BACKGROUND[2]

In October 2021, a source of information ("SOI") told Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") Michael Mote "information about an unidentified male involved in narcotics-related activity and money laundering." (ECF No. 1 ¶ 13.)  Law enforcement later identified that man as Juan Carlos Carmona-Rivas, the codefendant in this case.[3]  (*Id.*)  While the SOI did not know his name, the SOI provided a phone number for Carmona-Rivas and told investigators that he was driving a silver Cadillac SUV with Colorado license plate BRK-L60.  (*Id.*)

Law enforcement obtained a GPS data location search warrant for the phone number that the SOI provided.  (*Id.* ¶ 14.)  After conducting surveillance, investigators were able to identify an apartment complex associated with Carmona-Rivas, 3260 South Irving Street, Denver, Colorado.  (*Id.*)  This complex has several different buildings; law enforcement conducted surveillance to determine in which apartment Carmona-Rivas lived.

On October 26, 2021, TFO Mote and TFO Bret Starnes saw Carmona-Rivas "drive into the parking lot in the Cadillac, exit the driver's seat, walk toward Building C, and ultimately walk out of sight of surveillance."  (*Id.* ¶ 15.)  Shortly thereafter, Carmona-

---

[2] Given that there is virtually no dispute regarding the facts at issue, the Court takes the Background section in large part from the Criminal Complaint (ECF No. 1), as cited in the Motion and the Government's response (ECF Nos. 42, 52).  Citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination, or the "INV" citation provided by the Government in ECF Nos. 1 and 52.  This factual summary is also taken from the parties' briefs and supporting exhibits.

The Court notes that it was difficult, and in some cases impossible, to find the citations to "INV" evidence.  In future briefing, both parties are directed to more clearly identify either an exhibit or CM/ECF citation for exhibits and evidence cited.

[3] On July 12, 2022, Carmona-Rivas filed a Notice of Disposition.  (ECF No. 60.)

Rivas exited Building C, entered a silver Chevrolet Impala (license plate BIJ-C14), and drove away.  (*Id.*)

On October 29, 2021, TFO Mote and TFO Starnes watched as Carmona-Rivas left Building C, entered the Cadillac, and drove away.  (*Id.* ¶ 16.)  TFO Mote contacted Denver Police Department ("DPD") officers for assistance, and they stopped Carmona-Rivas after they observed him committing traffic infractions.  (*Id.*)  When stopped, he said that he did not speak English, and did not have identification or a driver's license.  (*Id.* ¶ 17.)  However, Carmona-Rivas provided his name, his date of birth, an address, and a telephone number.  (*Id.*)  The number he provided matched the number that the SOI had given TFO Mote.  (*See id.* ¶¶ 14, 17.)  However, Carmona-Rivas did not have a valid driver's license; he was told he could not drive and was released on foot with a warning.  (*Id.* ¶ 17.)  Detective Jamie Akens responded to the scene with a narcotics detection dog, which alerted to the odor of illegal narcotics within the parked Cadillac.  (*Id.*)

In November 2021, TFO Mote gave the above information to DPD Detective Joe Garcia for further investigation.  (*Id.* ¶ 18.)  On December 8, 2021, Detective Garcia conducted surveillance, saw the Cadillac, and saw Carmona-Rivas walk to the third floor of Building C.  (*Id.* ¶ 19.)  The following day, he saw Carmona-Rivas enter Apartment C-302 with a key and leave later that day to drive to the grocery store in the Cadillac.  (*Id.* ¶ 20.)

On December 10, 2021, Detective Garcia saw a male who was later identified as Defendant exit Apartment C-302 while wearing "a gray coat, red hat, and carrying a backpack."  (*Id.* ¶ 21.)  Defendant drove away in the Impala, which was on Dartmouth

Avenue and was the same Impala that law enforcement had previously seen Carmona-Rivas drive. (*Id.* ¶ 21.) Detective Garcia followed the car but eventually lost it in traffic. (INV_0055.) Detective Garcia also checked the registration and registered address for the Cadillac and the Impala. (*Id.*) Neither car was registered to Defendant, Carmona-Rivas, or Apartment C-302. (*Id.*) According to the Government, Detective Garcia knows that narcotics traffickers rarely list cars in their own name and address to prevent detection from law enforcement. (*Id.*; ECF No. 52 at 3.)

On December 14, 2021, Detective Garcia drove by the apartment complex and saw the Impala parked on Dartmouth Avenue. (INV_0056.) When he returned at 11:50 a.m., the Impala was no longer parked at that location. (*Id.*)

On December 15, 2021, Detective Garcia saw Defendant exit Building C while wearing a gray coat, read hat, and carrying a backpack, and enter the Impala. (ECF No. 1 ¶ 22.) The car was parked on Dartmouth Avenue. (INV_0056.) Defendant drove away; Detective Garcia tried to follow the car but was unable to do so. (*Id.*)

On December 17, 2021, Detective Garcia observed Defendant leave Apartment C-302 and walk to the Impala. (*Id.*) Again, the car was parked on Dartmouth Avenue; Defendant entered the car and drove away. (*Id.*) Officers attempted to follow the car but were unable to follow it due to traffic. (*Id.*)

Around 10:00 a.m., Detective Garcia watched as Carmona-Rivas exited building C, enter the Cadillac, retrieve a small bag, and go back to Building C. (ECF No. 1 ¶ 25.) A short time later, he left Building C and went back to the Cadillac, where he sat in the driver's seat for a "short time." (*Id.*) He then went into the passenger-side door of another vehicle where he conducted what investigators believed, based on their training

and experience, to be a hand-to-hand drug transaction with the unidentified driver of that vehicle.  (*Id.*)

Approximately thirty minutes later, DPD officers stopped Carmona-Rivas for driving without a license.  (*Id.* ¶ 26.)  He consented to a search of his person and the Cadillac; on his person, Detective Garcia found four bags containing a total of approximately 400 blue pills that tested presumptive positive for fentanyl.  (*Id.* ¶ 27.)  In the Cadillac, they found a cellular telephone and $1,125 wrapped in a green towel in the center console.  (*Id.*)  When asked where he lived, he stated that he lived at 3260 S. Irving Street, Building C, Apartment 302 "with another male."  (INV_0057.)  As a result, Detective Garcia began drafting a search warrant for Apartment 302, Building C, 3260 South Irving Street, Denver, Colorado.  (ECF No. 1 ¶ 29.)  The warrant was approved by an assistant district attorney at 1:16 p.m.  (INV_0112.)  The Honorable Kelly C. Cherry of the Denver County Court signed the warrant at 2:30 p.m.  (INV_0115; ECF No. 1 ¶ 29.)

While drafting the search warrant, Detective Garcia instructed DPD Detective Terrance Halliwill and DPD Officer Francisco Olazaba to detain Defendant if he came back to the general vicinity of the apartment.  (ECF No. 52 at 5 (citing INV_0057).)  Detective Halliwill and Officer Olazaba conducted surveillance to see whether Defendant would return to the apartment complex.  (*Id.* (citing INV_0047; INV_0050).)  Officers observed Defendant in the area, a couple of blocks from the apartment in the Impala, and stopped him.  (*Id.* (citing INV_0057–59).)  According to the Government, Detective Halliwill knows that individuals involved in narcotics sales and distribution will park at places other than their home to prevent discovery by law enforcement.  (ECF

7

No. 57-3.)

Per Officer Olazaba's body worn camera ("BWC") footage, at approximately 12:50 p.m., Officer Olazaba approached Defendant, asked him out of the car, and detained him.  (*Id.* (citing INV_0321; INV_0047).)  Law enforcement did not draw their weapons.  (ECF No. 57-3.)  Officer Olazaba spoke with him in Spanish so that Defendant could understand him.  (*Id.*)  Law enforcement did not force Defendant to the ground or deploy any restraints other than handcuffs.  (*Id.*)  When he asked why he was being detained, the officers responded that they had an order to search his apartment for drugs.  (ECF No. 42-2.)  Defendant denied consent to search the vehicle.  (ECF No. 42-1 at 1.)  As noted in the Motion and outlined above, Detective Garcia was still in the process of writing a search warrant, which was not signed until 2:30 p.m.  (ECF No. 52 at 6.)

At approximately 1:15 p.m., Officer Jessica Delarow responded to the scene with her drug detection dog.  (ECF No. 52 at 6 (citing INV_0024).)  The dog, which is trained to detect cocaine, methamphetamine, heroin, and ecstasy, positively alerted at approximately 2:22 p.m.  (*Id.*)  As a result, officers conducted a search of the Impala.[4]  Inside the car, they discovered 156 fentanyl tablets (15.400 grams), 22.14 grams of

---

[4] According to Defendant's reply, the parties agree that there is no BWC footage documenting the *Miranda* advisement, or the canine sniff of the vehicle and subsequent search.  (ECF No. 57 at 3 nn.2, 3.)  The only recorded footage of the matters at issue is Exhibit B to the Motion, which is a DVD of Officer Olazaba's BWC footage depicting two police DPD officers asking Defendant to exit his vehicle, patting him down, and placing him in handcuffs.  There is no reference to Exhibit B on the CM/ECF docket, but Defendant submitted the DVD to the Clerk's office as conventionally submitted material.

While Defendant describes the absence of additional details that were not captured by Officer Olazaba's BWC footage as "concerning" and "troubling," and he states that Officer Olazaba violated departmental BWC policies, he does not specifically assert any constitutional or statutory violation based on the absence of the footage.  (ECF No. 57 at 3–4.)  Therefore, the Court will not address this issue further.

heroin, and 4.315 grams of cocaine.  (*Id.* (citing INV_0060).)  According to the Government, Defendant was arrested thereafter.[5]  (*See* ECF No. 42 at 2, 3; ECF No. 42-1 at 1; ECF No. 57-6 at 2; ECF No. 65 at 8.)  A warrant had not been issued for his arrest.  (ECF No. 42 at 5.)

Inside Apartment C-302, officers recovered approximately 2.46 pounds of heroin, 2.17 pounds of cocaine, 544 fentanyl pills (55.706 grams), and 2.369 grams of methamphetamine.  (*Id.* (citing INV_0061).)

## II. LEGAL STANDARDS

### A.  Burden of Proof

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  However, "[t]he Amendment says nothing about suppressing evidence obtained in violation of this command.  That rule—the exclusionary rule—is a prudential doctrine created by th[e Supreme] Court to compel respect for the constitutional guaranty."  *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal citations and quotation marks omitted).  Under the exclusionary rule, a defendant may move for suppression of evidence obtained in violation of the Fourth Amendment.  *Id.*

On a motion to suppress evidence derived from a warrantless search and/or seizure, the defendant bears the burden of presenting a *prima facie* case that the Fourth

---

[5] The central dispute at issue in the Motion is whether, as Defendant argues, he was arrested at the time he was taken out of the Impala and placed in handcuffs, or as the Government argues, he was arrested after the officers searched the Impala and found drugs. Therefore, the Court's use of the word "arrest" here is of no moment; the Court will address the dispute *infra* in this Order.

Amendment has been "implicated," at which point the burden shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id.* at nn.1–2 (citing authorities).

**B.      Investigative Detention**

"Investigative detentions are Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012). Reasonable suspicion requires "considerably less" than preponderance of the evidence and "obviously less" than probable cause. *United States v. Gurule*, 935 F.3d 878, 885 (10th Cir. 2019); *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.") (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In other words, reasonable suspicion may exist even if it is more likely than not the individual is not involved in criminal activity. *See Gurule*, 935 F.3d at 885. It is not meant to be an onerous standard. *See United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). Rather, it merely requires that "officers develop a particularized and objective basis for suspecting an individual may be involved in criminal activity." *Id.* at 1379–80. When the officer has stopped a person based on reasonable suspicion of criminal activity, the officer may briefly detain the individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." *Oliver*, 209 F.3d at 1186 (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

When assessing reasonable suspicion, a court "defer[s] to all reasonable

inferences made by law enforcement officers in light of their knowledge and professional experience distinguishing between innocent and suspicious actions." *Id.* at 1379 (citing *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009)). Further, a court evaluates each factor alleged to support an inference of reasonable suspicion separately and in the aggregate. *Gurule*, 935 F.3d at 885 ("Although individual factors—when analyzed separately—might admit of innocent explanation, we may nonetheless hold they create reasonable suspicion in the aggregate.").

Under *Terry v. Ohio*, 392 U.S. 1 (1968), a court must examine whether the investigative detention was: (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Salas-Garcia*, 698 F.3d at 1248 (citation omitted). Throughout this analysis, a court is guided by the "touchstone" of reasonableness. *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). If the seizure fails the two-pronged *Terry* test for an investigative detention, then the seizure becomes an arrest that must be supported by probable cause. *Id.* (citations omitted).

### III. ANALYSIS

In his Motion, Defendant argues that "the evidence at the time of [his] arrest does not amount to probable cause." (ECF No. 42 at 9.) For support, Defendant points to the following facts: law enforcement never observed him interacting with Carmona-Rivas; Defendant was never observed selling or possessing narcotics; Defendant was never observed meeting with others in what might appear to be narcotics-related transactions; his movements were not surveilled, and his name was not known to law enforcement until the day of his arrest; and he was never observed entering Apartment

11

C-302 or spending the night there. (*Id.* at 8–9.) Rather, Defendant emphasizes that he "was only observed physically leaving Apartment C-302 twice, and he was driving a vehicle [the silver Impala] that Mr. Carmona-Rivas was, on one occasion, observed driving." (*Id.* at 9.)

Based on these arguments, Defendant states that "probable cause was lacking at the time he was placed in handcuffs and arrested" without a warrant. (*Id.*) In other words, he argues that "[a]t the time [Defendant] was told to exit his vehicle and was handcuffed, he was placed under arrest as opposed to being temporarily detained for the purposes of an investigatory stop." (ECF No. 57 at 6.) Therefore, he requests that the Court suppress: (1) Defendant's verbal response to the reason he was told he was being arrested; (2) Defendant's refusal to allow the vehicle he was driving to be searched; and (3) the drugs found in the vehicle that Defendant was driving. (ECF No. 42 at 9.)

For the following reasons, the Court concludes that at the time Officer Olazaba and Detective Halliwill told Defendant to exit his vehicle and handcuffed him, law enforcement's actions constituted an investigative detention that only required reasonable suspicion, not probable cause. Further, the Court concludes that law enforcement had the required reasonable suspicion to support the detention.

**A.    Justified At Its Inception**

First, the Court examines whether the investigative detention of Defendant was justified at its inception. In his reply, Defendant highlights what law enforcement did *not* know at the time of his purported arrest, including: they had no knowledge that Defendant was engaged in active or pending drug transactions at the time he was handcuffed; they had never witnessed him engaging in suspected drug transactions;

they had no evidence that Defendant possessed a firearm or other weapon; they had no knowledge of Defendant having a criminal or driving record; and they had no outstanding warrants for his arrest.  (ECF No. 52 at 6.)  Further, Defendant emphasizes that when he was placed in handcuffs he was "corporative."[6]  (*Id.*)  He reminds the Court that officers found no contraband or weapons on his person when he was patted down.  (*Id.*)  However, despite these facts, Defendant remained handcuffed.  (*Id.*)

Even considering the purported absence of knowledge or evidence highlighted by Defendant, the Court observes that the evidence demonstrates that law enforcement had substantial knowledge about Carmona-Rivas and additional knowledge connecting Defendant to Carmona-Rivas, described above.  Law enforcement knew that Carmona-Rivas was involved in the sale of narcotics, drove the same Impala that Defendant was later observed driving, and lived at the same location from which Defendant was seen exiting.  TFO Mote and Detective Starnes provided information to Detective Garcia about Carmona-Rivas.  (ECF No. 1 ¶ 18; ECF No. 57-4.)  After several more hours of surveillance, Detective Garcia ultimately determined that Carmona-Rivas lived in Building C, Apartment 302, with another male.  (ECF No. 57-4 at 3.)

On December 10, 2021, Detective Garcia saw a male, who was later identified as Defendant, exit Apartment C-302 while wearing "a gray coat, red hat, and carrying a backpack."  (ECF No. 1 ¶ 21.)  Defendant drove away in the Impala, which was on Dartmouth Avenue and the same Impala that law enforcement had previously seen Carmona-Rivas drive.  (*Id.* ¶ 21.)  Thus, law enforcement knew that Defendant was associated with the suspected stash house located in Apartment C-302.

---

[6] The Court believes Defendant meant "cooperative."

13

On December 17, 2021, Detective Garcia was present when law enforcement conducted a traffic stop on the Cadillac that Carmona-Rivas was driving, searched Carmona-Rivas and the Cadillac with consent, and found fentanyl pills on Carmona-Rivas's person and money in the Cadillac.  (ECF No. 57-4 at 3.)  Detective Garcia handcuffed Carmona-Rivas and advised him of his *Miranda* rights.  (*Id.*)  He advised Officer Olazaba and Detective Halliwill to detain Defendant if he returned to the scene.  (*Id.*)  As the Government points out, Officer Olazaba and Detective Halliwill were, therefore, acting pursuant to the collective knowledge doctrines.  (ECF No. 52 at 11 (citing *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012) ("Under the collective knowledge doctrine, the officer who makes the stop need not have reasonable suspicion that criminal activity is afoot.  Instead, the knowledge and reasonable suspicions of one officer can be imputed to another.")).)

Further, the Government points out that certain actions of Carmona-Rivas and Defendant specifically indicate their involvement in drug-related activity.  Neither the Cadillac nor the Impala was registered to Carmona-Rivas, Defendant, or the apartment, which based on the training and experience of the officers is a common technique drug traffickers use to prevent law enforcement from finding their addresses.  (ECF No. 52 at 11.)  Further, Defendant typically parked the car on Dartmouth Avenue, away from the apartment, which again, based on the training and experience of the officers, is a common technique utilized by drug traffickers to prevent their identification by law enforcement.  (*Id.* at 11–12; ECF No. 57-4 at 1.)

Based on these facts, the Government argues, and the Court agrees, that law enforcement had reasonable suspicion to initially detain Defendant:

> (1) the Defendant shared access to the Impala with his suspected roommate who had, approximately two hours earlier, been caught with distribution-levels of fentanyl; (2) the Defendant frequented Apartment C-302, an apartment which the officers were in the process of documenting their probable cause as a stash house for drug trafficking; (3) because the Defendant had access to Apartment C-302, detention of the defendant during the execution of the search would promote officer safety; and (4) because officers were preparing to search an apartment which the Defendant had access to, and that his suspected roommate had just been arrested, the likelihood that the Defendant would flee was extremely high.

(ECF No. 52 at 12.) The Government underscores the fact that law enforcement was in the process of securing a warrant to search Apartment C-302—where they suspected Defendant resided—as providing added justification for Defendant's detention. (ECF No. 65 at 5.) *See Michigan v. Summers*, 452 U.S. 692 (1981) (upholding detention of resident exiting a house pending execution of a search warrant on that house); *see also Illinois v. McArthur*, 531 U.S. 326, 331–33 (2001) (two-hour detention of trailer home resident reasonable where police, acting with diligence, obtained a warrant to search the trailer home for drugs). Additionally, law enforcement had a legitimate interest in minimizing the risk to themselves, as executing a search warrant to search for narcotics "is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." (ECF No. 65 at 6 (citing *Summers*, 452 U.S. at 702–03).)

Based on this evidence, the Court determines that the investigative detention was justified at its inception.

### B.     Reasonably Related in Scope to the Circumstances

The Court finds that Defendant's investigative detention was reasonably related in scope to the circumstances which justified the interference in the first place. As the Government points out, officers used a minimal amount of force in that they did not

15

conduct a "felony stop,"[7] draw their weapons, threaten Defendant, or use an excessive amount of physicality in detaining him. (ECF No. 52 at 12.) Additionally, the officers spoke to Defendant in a conversational manner in Spanish, which the Government states is his "preferred language." (*Id.*; *see* ECF No. 42, Exhibit B (video of investigative detention).) The investigative detention occurred during the day, when innocent civilians could be walking around the street and the apartment complex. *See Salas-Garcia*, 698 F.3d at 1252 (reasonableness of investigative detention supported by fact that the "events transpired in the middle of the day, when several people were entering and leaving the parking lot of a busy hospital").

Although it is apparent from the video of the detention that Defendant did not resist the officers or try to flee, the Court determines that it was nonetheless reasonable under the circumstances for officers to restrain Defendant with handcuffs. The use of handcuffs or placing suspects on the ground during a *Terry* stop "do[es] not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment." *Salas-Garcia*, 698 F.3d at 1249 (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)); *see also Lundstrom v. Romero*, 616 F.3d 1108, 1122 (10th Cir. 2010) ("Handcuffing may be appropriate during an investigative detention—an investigative detention does not become unreasonable just because officers handcuff an individual."); *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) (holding that the police officers' drawing of firearms and use of handcuffs was reasonable). However, the Tenth Circuit has

---

[7] A "felony stop" involves "a very heightened state of readiness" by the police, where the officers arrive in "several units with guns drawn, giving specific orders to an occupant of a vehicle to do certain things." *Salas-Garcia*, 698 F.3d at 1250. Here, Defendant does not assert that a felony stop occurred, and therefore the Court need not address this type of interaction any further.

observed that "the use of force such as handcuffs and firearms is a far greater level of intrusion, and requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Salas-Garcia*, 698 F.3d at 1249 (quoting *United States v. Melendez–Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (internal quotation marks omitted)).

The Tenth Circuit has found it reasonable for officers to handcuff a defendant on the basis of public safety and where the stop involved a large drug transaction. *Id.* at 1251–52; *United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006) (recognizing that a that "[a] connection with drug transactions can support a reasonable suspicion that a suspect is armed and dangerous"). Here, law enforcement had recently arrested Carmona-Rivas and found fentanyl pills and cash following a search, and they suspected that Defendant was working with Carmona-Rivas. Once Defendant was detained, Detective Halliwill states in his report that Sergeant Tyson Worrell requested that Detective Delarow respond to the stop location to conduct a canine sniff of the Impala. (ECF No. 57-3 at 1.) It was only after Detective Delarow arrived and deployed her canine, which positively alerted to the odor of narcotics inside the Impala, that law enforcement searched the Impala, recovered narcotics, and then arrested Defendant. (ECF No. 42-1 at 1; ECF No. 57-3 at 1; ECF No. 57-6 at 2.) Under these circumstances, the Court finds that law enforcement's use of handcuffs during the investigative detention was reasonable and did not transform the stop into an arrest, which would require probable cause.

The Court notes that in his reply, Defendant attempts to argue that the detention was in fact an arrest by repeatedly using the phrase "detained, AKA arrested." (ECF

17

No. 57 at 2, 3, 4, 5.) It is difficult for the Court to discern why defense counsel would attempt in this manner to conflate two heavily-freighted legal terms which literally hundreds of court decisions have endeavored to distinguish. In any event, and as explained above, the Tenth Circuit uniformly distinguishes an investigative detention from an arrest; it is not mere semantics or "AKA," as Defendant's brief suggests. To that end, the Government points out that the reports of the law enforcement officers in this case are remarkably consistent in their description of the events of the detention which subsequently led to Defendant's arrest. (ECF No. 65 at 8.) Officer Olazaba, Detective Halliwill, and Detective Garcia all describe the encounter as a detention, not an arrest.[8] (ECF No. 57-2 at 1; ECF No. 57-3 at 1; ECF No. 57-4 at 3.)

The only report which indicates Defendant was formally arrested is TFO Mote's report, in which he first observes that "[a]s [Defendant] exited the vehicle, he was contacted by officers."[9] (ECF No. 57-6 at 2.) TFO Mote then describes the arrival of Detective Delarow, the canine sniff, positive alert to narcotics, the search of the Impala which revealed narcotics, and that Defendant "was subsequently placed under *arrest*." (*Id.* (emphasis added).) The fact that no other officers used the word arrest, and that

---

[8] Defendant states that Officer Olazaba reports that he identified Defendant and "arrested him," but Officer Olazaba does not use the word "arrest" in his report. (ECF No. 57-2 at 1.) Rather, he specifically states that he "conducted a traffic stop and detained the driver. He was identified as CURIEL RODRIGUEZ, SAUL." (*Id.*)

[9] Defendant states that Detective Garcia also contends that he was detained temporarily and only later arrested after the canine sniff and vehicle search. (ECF No. 57 at 5, 11.) However, the document that Defendant cites for support, "Garcia Affidavit In [S]upport of Arrest Warrant, Doc. # 1, p. 9, ¶ 28," appears to be TFO Mote's affidavit, not Detective Garcia's affidavit. (ECF No. 1 ¶ 1 ("Michael Mote, your affiant, a Task Force Officer . . . .").)

The Court is aware that the Affidavit In Support of Search Warrant was sworn by Detective Garcia, but it appears solely related to the search of Apartment C-302 and does not appear to describe the circumstances of Defendant's detention and subsequent arrest. (ECF No. 65-1.)

TFO Mote distinguishes between the officers' initial "contact" with Defendant and his subsequent "arrest" demonstrates that he drew a factual distinction between the actions by law enforcement.

The Court has undertaken above the fact-sensitive inquiry to determine that a detention, not an arrest, occurred when law enforcement asked Defendant to exit his vehicle.  Given the evidence before the Court, the Court rejects Defendant's attempt to conflate the very terms on which the central argument of his Motion is based.  Moreover, Defendant does not argue that law enforcement lacked probable cause to arrest him once they discovered illegal drugs in the Impala.  Therefore, the Court concludes that the investigative detention was reasonably related in scope to the circumstances which justified the interference in the first place.  The Court will not suppress the evidence requested by Defendant.

## IV. CONCLUSION

For the reasons stated above, the Court ORDERS:

1. Defendant's Motion to Suppress (ECF No. 42) is DENIED; and

2. The Court will separately enter an Order setting a Final Trial Preparation Conference and Trial Dates.

Dated this 18th day of August, 2022.

BY THE COURT:

_____
William J. Martinez
United States District Judge